UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

R.B. and M.L.B., individually and on behalf of
   D.B.,

     Plaintiffs-Appellants,

-against-

New York City Department of Education,

     Defendant-Appellee.

**COMPLAINT**

**Case No. 13-CV-1131**

**ECF CASE**

Plaintiffs R.B. and M.L.B., individually and on behalf of D.B., by their attorneys, Skyer

& Associates, L.L.P., as and for their Complaint, allege and state the following:

**PRELIMINARY STATEMENT**

1.   Plaintiffs R.B. and M.L.B., on behalf of their child, D.B., bring this action pursuant to

Section 1415(i)(2) of the Individuals with Disabilities Education Improvement Act

("IDEA"), as amended (20 U.S.C. § 1400 *et seq.*), the pertinent implementing

regulations promulgated under the Code of Federal Regulations, Article 89 of the

New York State Education Law, and Part 200 of the Commissioner's Regulations

against the New York City Department of Education (the "DOE"), seeking review

and reversal of the State Review Officer's ("SRO") decision dated October 17, 2012,

which denied the Parents' request for reimbursement of tuition paid to a private

school for the 2011-2012 school year.  (SRO Decision, a copy of which is appended

hereto as Exhibit *1.) [1]

---

[1] Consistent with the usage below, exhibits preceded by an alphabetic reference were exhibits
introduced by D.B.'s Parents at the IHO hearing.  Numerical exhibits were introduced by the

2.   D.B. has autism and a significant sensory integration dysfunction, which impact on his ability to interact and communicate with other students and adults, attend to instruction, and otherwise function in a classroom and larger world environment.

3.   The DOE failed to offer a free appropriate public education ("FAPE") to D.B. for the 2011-2012 school year. In response, the Parents continued with his enrollment at the Rebecca School, a private school that had previously been determined to be appropriate for D.B. by an Impartial Hearing Officer ("IHO").

4.   On February 28, 2012 IHO Christine Moore issued a decision erroneously holding that the DOE had offered D.B. a free appropriate public education.

5.   The Parents timely appealed the IHO's decision by filing a Petition for Review with the New York State Education Department's Office of State Review.  The Parents appealed the IHO's findings regarding the appropriateness of the DOE's proposed placement and asked that the Office of State Review consider the entirety of the record evidence and render a determination that the Rebecca School placement was appropriate for D.B. and that a consideration of the equities entitled the Parents to full tuition reimbursement.  Instead, the SRO improperly upheld the IHO's determination that the DOE offered D.B. a FAPE.

6.   Through this action, Plaintiffs seek a determination that:

a.   The DOE failed to provide D.B. with a FAPE for the 2011-2012 school year;

b.   The Rebecca School was an appropriate placement for D.B. Neither the IHO nor the SRO considered such appropriateness in their review, however the record makes clear that the placement was appropriate for D.B.;

---

DOE.  Citations beginning with "Tr." indicate pages within the transcript of the hearing before the IHO.  Starred exhibits have been attached to this Complaint.

c. The equities favor D.B. and thus require that the DOE reimburse D.B.'s Parents for the Rebecca School tuition. Neither the IHO nor the SRO directly addressed the equities in their review, however the record makes clear that the Parents cooperated with the DOE in an effort to develop and identify an appropriate placement for D.B.; and

d. That D.B. is entitled to any other further relief as may be just under the circumstances.

**JURISDICTION**

7. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, and 20 U.S.C. § 1415(i)(2)(A) and (3)(A). This Court has supplemental jurisdiction over any state law claims herein asserted pursuant to 28 U.S.C. § 1367, as such state law claims form part of the same case or controversy as the claims for which this Court has original jurisdiction.

8. Venue is proper under 28 U.S.C § 1391(b) because the parties reside in this judicial district.

9. If successful, Plaintiffs are entitled to costs and attorneys fees under 42 U.S.C. § 1988(b) and 20 U.S.C. § 1415(i)(3)(B) *et seq.*

**PARTIES**

10. Initials are used throughout this Complaint to preserve the privacy and confidentiality of the child, D.B., and the family consistent with the privacy provisions promulgated under section 1417(c) of the IDEA, and the Family Education and Privacy Rights Act, 20 U.S.C. § 1232(g).

11. Plaintiffs R.B. and M.L.B. are the Parents of D.B.  They reside, along with D.B., in New York, New York.

12. Defendant DOE is a corporate body, created by Article 52 of the New York State Education Law § 2550 *et seq.*, that manages and controls the public school system of the City of New York.  On information and belief, the DOE receives funding pursuant to the IDEA, and therefore must comply with that statute's provisions, including providing a FAPE to all students with educationally handicapping conditions, including D.B., who reside within New York City.  (*See* 20 U.S.C. § 1412).  The DOE's principal place of business is 52 Chambers Street, New York, New York 10007.

## FACTUAL ALLEGATIONS

### D.B.'s Disability and Its Educational Impact

13. At the time of the hearing D.B. was a 13-year-old student classified with Autism. D.B.'s functioning is impacted most significantly by language delays and sensory integration dysfunction.  His difficulty with processing sensory information affects how D.B. interacts, communicates, attends, and behaves.  Still, D.B. is a bright and verbal student, and capable of success in the classroom provided that he has individually designed special education services and incorporated sensory integration occupational therapy to aid in attention and focus.

### D.B.'s Educational History

14. D.B. first received special education services as a toddler, and was diagnosed with Pervasive Developmental Disorder Not Otherwise Specified ("PDD NOS") at about 2 years of age.

4

15. D.B. has attended various special education programs over the years,[2] as his disabilities thus far preclude participation in a general education classroom or community school.

16. During the 2011-2012 school year D.B. attended the Rebecca School, which serves students with neuro-developmental delays in relating and communication, and was the last agreed to placement between the Parents and the DOE.

17. Due to the Rebecca School's instructional programs, which incorporate sensory integration occupational therapy and techniques throughout the day, and the DIR/Floortime methodology, D.B. made substantial progress between September 2006, when he initially enrolled at Rebecca, and the 2010-2011 school year.

18. The parties met on February 9, 2011, to create D.B.'s Individualized Education Program ("IEP") for the upcoming 2011-2012 academic year. D.B.'s mother, representatives from the Rebecca School, a parent member, and two Department of Education employees assigned to administrative duties, Ms. Feng Ye and Ms. Rose Fochetta, attended this meeting. (*See* Ex. 1).

19. The record establishes that Ms. Ye's familiarity with D.B. was limited to a 25 minute observation of him in his class at the Rebecca School on November 8, 2010. The record is silent as to Ms. Fochetta's familiarity with D.B. (*See* Ex. 4).

20. The DOE did not intend to implement the program recommended for D.B. at the February meeting until July 2011, and provided no explanation or rationale for holding the meeting five months prior to the July start of the school year. (*See id.* at 2).

---

[2] D.B. attended the Central Park Early Learning Center at the recommendation of Respondent's CPSE.

21. Because the DOE employees refused to meaningfully consider the input of M.L.B. and D.B.'s Rebecca School teachers at the meeting, the program recommendation resulting from the IEP meeting was wholly inappropriate for D.B. and was not reasonably calculated to confer an educational benefit upon him.

22. In violation of the law, the DOE failed to properly evaluate D.B. prior to the IEP meeting, with the result being that the IEP team lacked legally required information regarding D.B.'s needs, abilities, and interests. (*See* 8 NYCRR §200.4(b)(6)(viii)).

23. The DOE employees refused to consider appropriate evaluative data available to them when creating D.B.'s IEP. (*See* Ex. 1; Ex. 2).

24. Further dooming D.B. to an inappropriate program, the DOE employees failed to meaningfully reference the Rebecca School Progress Report when creating D.B.'s IEP, with the result being that essential information about D.B.'s needs and appropriate instructional techniques was missing from the IEP.  (*See id*.).

25. The annual goals included in D.B.'s IEP were generic and vague, were not measurable or assessable, and did not appropriately address his identified areas of need. (*See* Ex. 1 at 6-13).

26. In violation of the law, the IEP team failed entirely to include any short term objectives in D.B.'s IEP. This resulted in annual goals that were not measurable and would have resulted in D.B.'s teachers and Parents being unable to assess whether D.B. was making any progress towards the goals.[3] (*See* 8 NYCRR § 200.4(d)(2)(iv)).

---

[3]  While the IEP includes annual goals that are labeled as short term objectives, Ms. Ye testified that the team did not include any short term objectives and mislabeled the annual goals due to shortcomings in the DOE's IEP template. *See* Tr. at 40-41; Tr. at 93.

27. In contravention of Federal and State law and regulations, the IEP team failed to recommend parent training and counseling for D.B. and his Parents. (*See* Ex. 1; 8 NYCRR § 200.13(d); 8 NYCRR § 200.1(kk), (qq); 34 C.F.R. § 300.34).

28. The IEP team failed to include a clearly effective and appropriate educational and therapeutic methodology on D.B.'s IEP. (*See* Ex. 1).

29. The IEP team failed to consider recommending a non-public school program for D.B., and determined his school placement based solely on the availability of a 6:1:1 staffing ratio. (*See* Ex. 1 at 15; Ex. 2).

30. At the IEP meeting M.L.B. and D.B.'s teacher at the Rebecca School attempted to offer input into the development of an appropriate program for D.B.  However, the DOE employees refused to consider this input or develop a program individually designed to address D.B.'s needs, failed to consider recommending that D.B. continue to attend the Rebecca School despite admitting that he was making progress there, and only considered the 6:1:1 program generally recommended by the DOE for students with autism, despite concerns and objections raised by M.L.B. and D.B.'s teacher that such a program would not be appropriate for D.B. as they are for much lower functioning children. (*See* Ex. 1; Ex. 2; Tr. at 94-95).

31. While M.L.B. was informed at the IEP meeting by the DOE's school psychologist that she would ensure that D.B. was functionally grouped with students with similar needs, no indication for this need appeared in the IEP, and the Parent later learned that the functional level of the students in the class proposed for D.B. was not appropriate. (*See* Ex. 1).

32. Over the objection of every participant in attendance with more than passing exposure to D.B. and knowledge of his educational needs, the DOE employees concluded that D.B. should be educated in a 6:1:1 class within Defendant's District 75. Upon information and belief, the 6:1:1 program recommended for D.B. is Defendant's standard default program recommendation for students with autism attending public schools.

33. Accordingly, the Parents assert that the February 2011 program recommendation was a generic recommendation made without any consideration of D.B.'s actual needs and abilities.

34. On Friday, June 17, 2011, a notice of the Parents' concerns with the DOE's IEP was sent to the DOE. The Parents offered to meet with the CSE to discuss their concerns and stated that if these concerns were not addressed, they intended to continue D.B.'s placement at the Rebecca School[4] ("Rebecca") and seek public funding for the placement. That notice detailed seven of the Parents' concerns, as follows:

a. the program recommendation was inappropriate to address D.B.'s individual needs and was based solely on the generic program available along the DOE's continuum of services;

b. the methodology used by the proposed program would not be able to appropriately address the goals contained within D.B.'s IEP;

c. Respondent inappropriately barred D.B. from participation in standardized testing;

---

[4] Rebecca School is the last placement agreed to by the parties as the appropriate placement for D.B.

d. M.L.B. was denied the ability to meaningfully participate in the February 2011 IEP meeting, as she was first ignored and later reprimanded for requesting additional information from the team about the program proposed for her son;

e. M.L.B. asked the Committee to include goals in certain academic areas; however, the CSE employees refused to do so on the purported ground that they do not "typically" include such goals in IEPs;

f. M.L.B. asked that individualized parent training be discussed and included in D.B.'s IEP but was informed that such special education service was programmatically provided, and not individualized;

g. the IEP team refused to consider the independent evaluation provided by the Parents and insisted on including irrelevant or outdated data on the IEP. (Ex. C).[5]

35. While the notice "serve(d) the important purpose of giving the school system an opportunity, before the child is removed, to assemble a team, evaluate the child, devise an appropriate plan, and determine whether a [FAPE] can be provided in the public schools," here, the DOE failed to take any action in response to the notice. (*See Greenland Sch. Dist. v. Amy N.*, 358 F.3d 150, 160 (1st Cir. 2004)).

36. The Parents also notified the DOE that, as of June 17, 2011, no school placement had been received. (*See* Ex. C).

---

[5] References to "Ex." refer to Exhibits entered into the record at the underlying Impartial Hearing. Exhibits entered at the request of Petitioners are labeled with letters, while those entered at the request of Respondent are labeled with numbers. "Decision" refers to the IHO's Decision, issued on February 28, 2012. "Tr." refers to the transcript from the underlying hearing. The symbol ¶ refers to Paragraphs within this Complaint.

37. On Friday, June 24, 2011, the Parents received a letter from the DOE assigning D.B. to P.79 for the 2011-2012 school year. No response was ever provided as to the other concerns in the Parents' June 17, 2011 letter. (*See* Tr. at 402).

38. M.L.B. called the school a total of seven times on the afternoon of Friday, June 24, 2011, the day she received the letter from the DOE, and the following Monday, June 27, 2011, to schedule a visit to determine whether the school could appropriately implement the IEP and was otherwise appropriate for D.B. (Tr. at 403-404).

39. M.L.B. was permitted to visit P.79 only on Tuesday, June 28, 2011, the last day of the 2010-2011 school year. During her visit M.L.B. was shocked to discover that the school was a high school. D.B. was entering eighth grade, which is middle school. M.L.B. was further informed by the "Parent Coordinator" that there was no middle school class, but that there *might* be a middle school class during the summer of 2011, that *might* continue in September 2011, and that the school was a vocational school. M.L.B. was informed by the "Parent Coordinator" that the school had no knowledge of the students that might be in the middle school class during the summer of 2011 and was directed to return in July 2011 by the school's "Parent Coordinator." (Tr. at 403-406).

40. M.L.B. again visited the school on July 13, 2011, the first day she was permitted to visit the summer program, with Ms. Lynne Kalvin, a Rebecca School social worker, where they were introduced to a teacher who identified herself to them as "Ms. Grammer," and who told them that she was the teacher of the class that D.B. would be placed in, that it was her first day and that she knew nothing about the students in her class, including their ages or academic abilities. (Tr. at 406-407).

41. M.L.B. was introduced to the vocational coordinator for the school, who informed her that the school only issued IEP diplomas, and that all but the very lowest functioning students in the school worked for several hours per day instead of attending academic classes. The vocational coordinator told M.L.B. that the school was not appropriate for a student like D.B., whose goals are academic. The DOE failed to present testimony of the vocational coordinator or otherwise rebut M.L.B.'s testimony on this issue. (Tr. at 408-409).

42. M.L.B. was informed that there was no OT gym or room of any kind, no suspended equipment, and the staff was unable to tell M.L.B. whether the occupational therapist had any experience treating sensory integration disabilities such as D.B.'s. (Tr. at 408-410).

43. Instead of presenting testimony from Ms. Grammer, the DOE presented testimony from Janet Sencion, a special education teacher employed by the DOE. The DOE presented no evidence (even from Ms. Sencion) that D.B. would have been in Ms. Sencion's class and no explanation of why Ms. Sencion testified instead of Ms. Grammer. Ms. Sencion swore under oath that she was teaching a 6:1:1 class at P.79 on the first day of school in July 2011, and for the entire summer, including on July 13, 2011, however, she was not aware of how students were selected to be placed in her class. (*See* Tr. at 142; Tr. at 143; Tr. at 145; Tr. at 188; Tr. at 195-196.)

44. Ms. Sencion holds an *initial* certification to teach special education to students who range in age from kindergarten through sixth grade. Ms. Sencion is not licensed to teach seventh, eighth, or ninth grade students. D.B. was an eighth grade student during the 2011-2012 school year. (Tr. at 185; Ex. 1-1).

11

45. Ms. Sencion testified that the academic functional levels of the students in her class ranged from kindergarten to sixth grade in all areas. (Tr. at 148). This far exceeds the acceptable range of functioning that Ms. Ye testified the IEP team contemplated for D.B., and would not constitute an appropriate functional grouping for D.B. (*See* Tr. at 114-115).

46. Ms. Sencion testified that she would not have taught D.B. beginning in September 2011, and that despite his significant issues with transitions, he would have been transitioned to another new class at that time. Ms. Sencion had no knowledge of the teacher or classroom that D.B. would have transferred to and spent the majority of the year with. The DOE did not present testimony from the teacher that D.B. would have had for the majority of the school year. (Tr. at 194-195).

47. Ms. Sencion did not know whether the school had the occupational therapy ("OT") equipment, including any hanging equipment, necessary to address D.B.'s OT sensory needs and the DOE, despite their obligation to do so, failed to call any witness to testify about the availability of OT, including such equipment, despite D.B.'s significant OT needs. (*See* Tr. at 151-152).

48. Ms. Sencion testified that she understood D.B.'s social and emotional performance to be like "every student with autism," but that her review of the IEP indicated that D.B.'s social and emotional management needs required, in her view, "too many sensory materials throughout the day." [6] So, Ms. Sencion testified that she would massage D.B., and only allow him to use the sensory materials in her classroom and that she would speak in a low voice "to help his mind regulate." This disregard of the

---

[6] It should be noted that Ms. Sencion has never evaluated, observed, or even met D.B.

IEP clearly would not meet D.B.'s needs and thereby denies him a FAPE. (Tr. at 152; Tr. at 170-172).

49. Describing vocational programming for her students, Ms. Sencion testified "Inside the school, we have a space where they can fix things. They fix stuff. This area where they when it comes into clamping, so they wear—do with clamping leftovers, and things like that… We were doing shredding. We have all of those machines. He had shredding machines, laminating machines, and all of those stuff. And they would collect from teachers what type of work, if they need to laminate something, they will get it and go to our delaminating machine and do that for the teacher, which has to do with skills necessary to work in office or retailing and stuff like that." This is grossly inappropriate for D.B., because he functions at a much higher level and because such vocational training is not part of his IEP goals. (Tr. at 191-192; *See* Ex. 1).

## THE HEARING OFFICER'S FEBRUARY 28, 2012 DECISION

50. On February 28, 2012, after four days of hearing, IHO Christine Moore rendered a decision denying the Parents' request for reimbursement of tuition paid to the Rebecca School. (IHO Decision at 18).

51. IHO Moore dismissed any concern with the DOE's failure to conduct a vocational assessment "in this specific instance," on the factually incorrect basis that the evaluations considered by the IEP team identified D.B.'s skills, aptitudes, and interests. (IHO Decision at 11-12). Such reasoning is flawed, as none of the evaluations cited by IHO Moore even mention D.B.'s vocational interests and abilities nor do they provide any support for placing D.B. in a vocational program. Despite this, the DOE placed D.B. in a vocational *high school*.

13

52. IHO Moore found that D.B.'s IEP "describes his *present* academic performance and learning characteristics and is consistent with the findings and conclusions of the psychoeducational evaluations, the student's teacher reports and classroom observation." (IHO Decision at 12) (emphasis added). This determination is not supported by the record, which makes clear that the IEP team knew, or should have known, that D.B. had made significant academic progress in the months leading up to the February 2011 IEP meeting and was likely to continue on such a trajectory. (*See* Tr. at 24-25; Ex. 5-3, 5-8).

53. In dismissing the Parents' allegation that the academic goals in the IEP are not reflective of the progress that D.B. made between February 2011 and July 2011, IHO Moore improperly relied solely upon Ms. Ye's baseless and uninformed testimony regarding D.B.'s slow rate of progress and ignored statements contained within the Rebecca School's December 2010 progress report detailing his excellent progress. (IHO Decision at 12-13). Ms. Ye's testimony regarding D.B.'s slow rate of progress is *contradicted* by the record. (*See id*; *See also* IHO Decision at 15; *Cf.* Ex. H at 9-16; Ex. 1 at 6-13).

54. IHO Moore states that the Parents could have requested that the IEP team reconvene to address concerns with the IEP. However, the record reflects that the Parents notified the DOE of their concerns with the IEP and advised that they were willing to meet with the CSE's Chairperson or an IEP team to further discuss their concerns, in writing, on June 17, 2011. (*See* Decision at 13; *See* Ex. C).

55. IHO Moore failed to address the IEP team's refusal to consider maintaining D.B. at Rebecca and the IEP team's failure to prove the appropriateness of changing D.B.'s

placement from Rebecca to a 6:1:1 class. (IHO Decision at 13; *See Application of a Student with a Disability*, Appeal No. 11-053).

56. IHO Moore referred to the concerns of M.L.B. and Rebecca staff relating to the DOE's recommended program; however, she failed to address such concerns in the Decision other than to provide a conclusory statement that the program is appropriate for D.B. (*See* IHO Decision at 13-14).

57. IHO Moore found the allegation regarding the lack of parent training or counseling on the IEP to be "undisputed"; however, she held that FAPE is not denied when a school provides a "comprehensive parent training component that satisfied the requirements of the State regulations." As her basis for that statement, IHO Moore erroneously cites testimony regarding parent training and counseling provided by the *Rebecca School* to support the "credible testimony that parent training would be provided" at the public placement. In fact, the DOE failed to present *any* testimony or evidence that such services were available. (IHO Decision at 14-15 (internal citations omitted)).

58. While IHO Moore found that goals were included in the IEP for the transitional paraprofessional, these goals were completely different from those discussed at the IEP meeting and do not address at all the specific skills that M.L.B. identified as being necessary and appropriate and that Ms. Fochetta, the DOE's school psychologist at the IEP meeting, promised would appear in the IEP.  (IHO Decision at 15).

59. IHO Moore's Decision found that the annual goals are not measurable, but excuses such failure stating that the "short-term objectives related to each of the annual goals

15

contain sufficiently detailed information such that the criteria for mastery or measurement of progress can be ascertained." IHO Moore provides no basis or citation to the record for such finding, nor could there be one, since the DOE's witness, Ms. Ye, *expressly* testified that the IEP included no short-term objectives. IHO Moore's decision here is thus factually incorrect, and without such measurable goals, the IEP is flawed and denies D.B. a FAPE.  (IHO Decision at 15).

60. IHO Moore's Decision fails to recognize that the DOE placed D.B. in a high school, rather than a middle school; that the school was focused on vocational, rather than academic, instruction; that the placement in the high school occurred without any justification, discussion with the Parents, or any consideration of the appropriateness of doing so, in direct contravention of its statutory obligation, and by doing so, denied the Parents meaningful participation in D.B.'s education and denied D.B. a FAPE.

61. The IHO's Decision is not well-reasoned or thorough, fails to address a number of allegations of the Parents, is not supported by the preponderance of the evidence, and is entitled to no deference from this Court.[7]

62. The IHO's determination that Ms. Sencion's class was appropriate, in part, because it sometimes uses aspects of ABA to instruct students is not supported by the record, and since Ms. Sencion mainly used TEACCH, and the DOE failed to prove the

---

[7] Further demonstrating the IHO's careless review of the record, the IHO mistakenly conflates M.L.B.'s two visits to P79 into one visit; and the IHO's comparison of the goals in the February 2011 IEP and the December 2011 progress report fails to recognize that the two sets of goals are substantially different, with the 12/11 goals being higher level goals. Thus, contrary to the IHO's erroneous conclusion, D.B. was indeed making progress between February 2011 and December 2011, and therefore was making progress between February 2011, when the IEP meeting took place, and July 2011, when the IEP was scheduled to be implemented by the DOE, and the IEP was thus outdated by the time it was to be implemented. *Compare* IHO Decision at 16 *with* ¶¶ 39-42.

appropriateness of using ABA or TEACCH to instruct D.B., her decision is entitled to no deference from this Court. (*See* Tr. at 391-393).

63. The DOE failed to present any testimony disputing the fact that the Parent and Ms. Kalvin were informed that D.B. would be placed in Ms. Grammer's class, and similarly failed to present any evidence that D.B. would have been placed in Ms. Sencion's class. The IHO failed to recognize or address this crucial issue.  As Ms. Sencion was not the teacher of the class offered to D.B., and none of the information she testified to was shared with M.L.B. when she visited P.79, her testimony is irrelevant and should be disregarded. (*See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

**The Appeal to the State Review Officer**

64. The Parents appealed the IHO's decision by serving a Verified Petition to the SRO on April 3, 2012.

65. The SRO is required by law to issue a decision within 30 days after the initiation of an appeal, absent the specific request by a party for an extension of time to render such decision. (34 C.F.R. §300.514(c); 8 NYCRR §200.5(k)(2)).

66. Upon information and belief, extensions were granted at the request of the DOE that permitted the SRO to render a decision by May 30, 2012.

67. The SRO failed to meet the extended deadline and did not issue a decision until October 17, 2012, 140 days after he was legally obligated to render such decision. In his decision, he dismissed the Parents' Appeal. (*See* SRO Decision at 33).

68. The SRO inappropriately refused to consider the Parents' allegations that the methodology used at P.79 was inappropriate for D.B., that the DOE's proposed

17

teacher was not licensed or certified to teach D.B., and that the DOE's proposed

teacher testified that she would not comply with D.B.'s IEP if he had attended P.79.

(*See* SRO Decision at 10).

69. Such refusal was inappropriate because the DOE opened the door to the issue of

methodology when, on direct examination of its own witness, it elicited testimony

from the teacher in an effort to demonstrate the appropriateness of her classroom for

D.B. (Tr. at 151-154).

70. The SRO's refusal to consider the qualifications of the proposed teacher and her

stated refusal to comply with D.B.'s IEP was inappropriate since it was the DOE that

offered the testimony of Ms. Sencion at hearing, thus making the issue of her

licensure and her stated refusal to comply with the IEP appropriate for review and

adjudication. (*See M.H. v. NYC Department of Education*, 712 F.Supp. 2d 125, 167

(2010), *aff'd*, 685 F.3d 217, 250-251 (2d Cir. 2012)).

71. While a FAPE does not include the right to a particular "brick and mortar" location,

or for parents to veto the placement determination made by a school, it does not

entitle a school district to play "fast and loose" with a disabled student's placement,

baiting parents by offering them one teacher and class when they visit, and then at

hearing, switching and claiming that they would have provided D.B. a different class

and teacher. (*See M.H.*, 712 F.Supp. 2d at 167).

72. The SRO inappropriately held that convening D.B.'s IEP meeting in February 2011,

even though the DOE did not intend to implement the IEP until July 2011, did not

deny him educational benefit or deny the Parents the right to meaningfully participate

in his education. (*See* SRO Decision at 11-12).

73. Such holding is based on a faulty premise by the SRO–that a conscious decision was made to hold D.B.'s IEP meeting in February 2011–when in fact the scheduling of the meeting in February 2011 was, according to Ms. Ye, "random".  (Tr. at 67-68).

74. The SRO attempted to buttress his holding with the supposition that scheduling the meeting in February 2011 "may be appropriate to allow for more time in the planning process," however, the SRO failed to reconcile such supposition with the DOE's failure to identify a school placement for D.B. until late June 2011. (*See* SRO Decision at 12; Tr. at 402).

75. The SRO's supposition that holding the meeting in February 2011 might result in the DOE resolving any concerns voiced by the Parents ignores the fact that the Parents shared their concerns regarding the proposed program before enrolling D.B. at the Rebecca School, and the DOE failed to respond to those concerns. (*See* Ex. C).

76. The SRO found that the IEP team lacked a special education teacher that was likely to implement the IEP, but nonetheless held that such failure did not deny the Parent's opportunity to meaningfully participate in the meeting or deny D.B. of educational opportunity. (*See* SRO Decision at 14).

77. Indeed, none of the DOE's employees had ever taught in a 6:1:1 class, and thus had no actual knowledge of the instruction that was provided or modifications and supports available within the proposed placement. (*See* Tr. at 78).

78. Such holding is also inappropriate because the Parent requested that the IEP team develop and include goals in the IEP in specific academic areas and the DOE employees refused to do so on the purported grounds that they did not "typically" include goals in such areas. Thus, the DOE had the temerity to attempt to excuse its

failure to meet its statutory obligations in D.B.' case on the ground that it habitually fails to meet its statutory obligations. The DOE employees also refused to consider and include in D.B.'s IEP the specific concerns of M.L.B. and Marguerite Cohn, D.B.'s special education teacher at the Rebecca School. (*See* Tr. at 101).

79. Ms. Ye attempted to excuse her unilateral decision as to which goals to include in the IEP without considering the input of M.L.B. and Ms. Cohn by testifying that "I'm not going to argue with the Parent and the classroom teacher [as to] what is appropriate and what is not appropriate (to include as an annual goal)..." (Tr. at 124). This statement demonstrates her disregard, disrespect and lack of understanding of a parent's right to *meaningfully* participate in the IEP development. Under the IDEA it was Ms. Ye's legal duty to address M.L.B.'s voiced concerns at the IEP meeting– whether she considered that "arguing" or not–and her refusal to do so was functionally tantamount to not allowing M.L.B. to speak at the meeting at all. Ignoring a parent's concerns expressed at an IEP meeting is inherently inconsistent with allowing the parent the opportunity to participate meaningfully. Further, given that Ms. Ye had no experience teaching a 6:1:1 class, her refusal to include goals in D.B.'s IEP was uninformed and baseless. (Tr. at 101).

80. The SRO inappropriately held that M.L.B. was permitted to meaningfully participate in the development of D.B.'s IEP and educational program when the record evidence demonstrates that the IEP team denied her the right to meaningfully participate, and failed to consider her concerns with, among other things, promising to identify and provide a transitional paraprofessional with specific skills regarding D.B.'s sensory

and academic needs, and instead providing a crisis management paraprofessional that did not have these skills for D.B.

81. M.L.B. testified that at the IEP meeting she expressed her disagreement with the suggestion that D.B. required a one-to-one transitional paraprofessional, and informed the team that D.B. needed an assistant teacher who had experience in working with students like D.B., who would be available to facilitate social interaction, provide academic instruction, and anticipate his social and emotional needs. M.L.B. stated that a transitional paraprofessional would only be appropriate if such person possessed specific skills that she detailed for the IEP team during the meeting. M.L.B. was assured that those specific skills would be included in the IEP, but they were not.[8] (*See* Tr. at 400-401; *See* Ex. 1; Ex. 2-2).

82. The SRO found that the DOE's failure to conduct a vocational assessment of D.B. constituted a procedural violation of the Act, but held that this did not deny D.B. of a FAPE because "the record did not indicate that the student would have been placed in a vocational program." (SRO Decision at 16).

83. As shown below, such holding is clearly contradictory to the record and is entitled to no deference from this Court.

84. On the last day of the 2010-2011 school year, M.L.B. was informed by P.79's "Parent Coordinator" that the school was a vocational high school that *might* have a middle school class during the summer of 2011. But, M.L.B. was never informed that there was even a possibility that if the school actually did have a middle school class it

---

[8] The IEP was mailed to the Parents subsequent to the IEP meeting.

would not be vocational. Indeed, Ms. Sencion's testimony was that the class engaged in a number of vocational tasks. (*See* Tr. at 403-406).

85. Ms. Sencion described the vocational aspects of her classroom, explaining that during the summer of 2011 the students in her class "They fix[ed] stuff. This area where they come when it comes into clamping [sic], so they wear – do with clamping leftovers, and things like that, on the second floor. We were doing shredding. We have all of those machines. He had shredding machines, laminating machines, and all of those stuff. And they would collect from teachers what type of work, if they needed to laminate something, they will get it and go to our delaminating machine and do that for the teacher..." (Tr. at 191).

86. Further, on a second visit to the school in July 2011, M.L.B. was introduced to the vocational coordinator for the school, and was informed by her that the school only issued IEP diplomas,[9] and that all but the very lowest functioning students in the school worked for several hours per day instead of attending academic classes. M.L.B. testified that the vocational coordinator admitted to her that the school was not appropriate for a student like D.B., whose goals are academic. The DOE failed to present testimony of the vocational coordinator or otherwise rebut M.L.B.'s testimony. (Tr. at 408-409).

87. The SRO incorrectly states that the IEP contained 49 short-term objectives that addressed D.B.'s deficits, when the record makes clear that the DOE included no short term objectives. (*See* SRO Decision at 18).

---

[9] An IEP diploma is not a standards-based diploma and not recognized in New York State as equivalent to a regular high school diploma.

88. Ms. Ye admitted that the IEP does not include any short term objectives, and testified that while some goals are labeled as short term objectives, this is only because of limitation in the format of the DOE's IEP. (*See* Tr. at 93).

89. Ms. Ye admitted that it would be impossible for a teacher or D.B.'s Parents to pick up the IEP, understand D.B.'s present levels of performance in any area of need, and understand what progress the IEP team expected the recommended program to confer. Remarkably, even Ms. Ye, the person who drafted the IEP, was unable to identify D.B.'s ability level as it related to the goals, and confirmed that the IEP failed to include any such information. (*See* Tr. at 93-100).

90. Ms. Ye admitted that the psychological evaluation conducted at the request of the CSE revealed specific areas of delay and need; however, she and Ms. Fochetta refused to include goals to target such needs despite M.L.B.'s express request to do so. (Tr. at 102-104).

91. Ms. Ye admitted that M.L.B. requested, and the IEP team refused, to develop and include goals in the IEP in specific academic areas, on the purported grounds that the team did not typically include goals in such areas. The IEP team also refused to consider and include in D.B.'s IEP the specific concerns of M.L.B. and Marguerite Cohn, D.B.'s teacher at the Rebecca School, as well as the functional levels and short term objectives provided in the Rebecca School progress report. (*See* Tr. at 101).

92. The SRO found that the DOE failed to include goals for adapted physical education and failed to describe the extent to which D.B. would receive this specially designed instruction. Despite this, the SRO improperly excused the DOE's failure to comply with the law without any reasoning. (*See* SRO Decision at 19).

93. The SRO improperly found that the 6:1:1 special class placement was appropriate for D.B., relying on retrospective testimony about what Ms. Sencion might have done if D.B. had attended her class for the 2011-2012 school year instead of the information that was known and available to the IEP team and the Parents when they elected to continue D.B.'s enrollment at the Rebecca School. (*See* SRO Decision at 21-26; *See also R.E.* 694 F.3d at 186-188).

94. The record does not support the proposition that the proposed 6:1:1 class placement was appropriate for D.B. and the SRO provided no analysis of why the placement was appropriate for D.B. No one on the IEP team had taught a 6:1:1 class, and the DOE failed to establish via testimony or any documentary evidence that a 6:1:1 class was appropriate for D.B., contrary to their legal obligation to demonstrate this. (*See* SRO Decision at 21-26.

95. The SRO, much like the DOE employees at the IEP meeting, ignored the fact that M.L.B. voiced her concern with the DOE's assignment of a paraprofessional for D.B. instead of placing him in a small class with an appropriately trained assistant teacher[10]. The SRO provided no analysis or reasoning for ignoring M.L.B.'s stated concerns, which is especially disturbing given that these concerns were in line with the factors that the State Education Department deemed to be "important

---

[10] M.L.B. stated that: "(D.B.) doesn't need a one-to-one person, he needs a small class ratio, because sometimes he needs one-to-one help with academics. So I asked what the qualifications of a transitional para would be, and they said a high school diploma with 12 credits towards an education degree, and I said- I mean, my concerns were that the--he really needs a (teaching assistant), not a transitional para. I don't even really know what a transitional para, on paper, is supposed to do. But what I had said is he needs someone who can facilitate social interaction, can help him with academics, can anticipate his emotional and social needs, has experience dealing with kids like him…" Tr. at 399-400.

considerations" when it formalized the *Guidelines for Determining a Student with a Disability's Need for a One-to-One Aide* one year later in *January 2012*.[11] (*See* Ex. 3).

96. The SRO improperly dismissed the Parents' claims regarding the lack of individualized parent training and counseling.

97. The SRO's dismissal of this claim was premised on parent training and counseling being the only service lacking in the IEP, however, as discussed in further detail above, the IEP failed to properly describe the instruction that was to be provided to D.B. (*See* SRO Decision at 27).

98. The SRO improperly relied on the testimony of Ms. Ye, who has never taught in a 6:1:1 program, to establish that parent training and counseling was provided on a programmatic level, however, the DOE failed to establish that the placement actually offered parent training and counseling. (*Id*.).

---

[11]The student's individual needs that require additional adult assistance; the skills and goals the student is planned to achieve that will reduce or eliminate the need for the one-to-one aide; the specific role (e.g., instructional, assistance with personal hygiene) that the aide will provide for the student; the extent (e.g., portions of the school day) or circumstances (e.g., for transitions from class to class) the student would need the assistance of a one-to-one aide (see Attachment 3); The potential benefits from assignment of the one-to-one aide and how these will be measured to determine continuation of the recommendation; the potential negative impact of assignment of a one-to-one aide for the student (e.g., self-image, isolation and/or development of independence).  NY STATE EDUCATION DEPT., SPECIAL EDUCATION FIELD ADVISORY, *available at* http://www.p12.nysed.gov/specialed/publications/1-1aide-jan2012.pdf (last checked February 19, 2012).

Further, the State Education Department clarifies that when a decision is made that a student requires a one-to-one aide, the DOE must: consider the qualifications of the individual (i.e., teaching assistant or teacher aide) that would be necessary to meet the needs of the student; establish a plan to monitor the student's progress toward the goals to be addressed by the assignment of the one-to-one aide and the student's continuing need for the one-to-one aide.

99. The SRO committed legal error in refusing to consider M.L.B.'s testimony that she and R.B. had relied on parent training and counseling in the past, and in failing to recognize that they would particularly require such services during the 2011-2012 school year, when D.B. was transitioning to a public school that used a different teaching methodology from the one used by the Rebecca School. (*See* SRO Decision at 27-28).

100. The SRO committed legal error and improperly dismissed the Parents' concerns regarding the assigned school. (*See* SRO Decision at 28-30).

101. The SRO committed legal error in holding that the DOE had no obligation to demonstrate that it would have implemented D.B.'s IEP if he had attended P.79. (*See R.E.* 694 F.3d at 191-192, *citing T.Y. v. NYC Department of Education*, 584 F.3d 412, 420) ("The Department may select the specific school without the advice of the parents so long as it conforms to the program offered in the IEP.").

102. The SRO improperly considered retrospective evidence of what Ms. Sencion might have done if D.B. had attended her class, instead of looking to the IEP's mandates and the information provided to M.L.B. by the school when she visited in June 2011, information that the Parents relied on when they ultimately decided to continue D.B.'s enrollment at the Rebecca School. (*See* SRO Decision at 30-32).

103. The SRO improperly refused to consider the Parents' concerns regarding the size of the school that D.B. was assigned to, stating that the record contained insufficient evidence from which to draw a conclusion, and essentially reversing the burden of proof. (*See* SRO Decision at 33, n. 19).

104.    The SRO committed legal error by holding that the question of functional

grouping was not ripe for review because D.B. had not been enrolled in the public

school and any such review would be hypothetical.   This is incorrect as a matter of

law.  M.L.B. first raised her concerns about the DOE's inability to functionally group

D.B. at the February IEP meeting.[12] M.L.B. continued to have concerns about the

DOE's ability to functionally group D.B. when she learned that it had placed him in a

vocational high school, instead of an academic middle school. The Parents then raised

such concerns in their due process complaint. The issues were thus appropriate for

review by the SRO, as the Parents' concerns were based on information known to

them at the time of the IEP meeting and learned when visiting the proposed school

prior to the beginning of the school year. *See also R.E.* 694 F.3d at 186-188.

105.    Rather than claiming that such concerns were speculative at hearing, the DOE

defended it at hearing, opening the door to the issue of the appropriateness of the

placement, and thereby made such designation appropriate for review, especially

given that New York State explicitly places the burden of proving such

appropriateness on the DOE.  (*See* N.Y. Educ. Law §4401(c)).

106.    The SRO, like the IHO, did not consider the appropriateness of the Rebecca

School for D.B. or whether the equities favored D.B.'s Parents' request for

reimbursement.  Such determinations are supported by the record evidence and the

District Court is authorized by statute to consider such evidence in rendering its

decision.

---

[12] On July 13, 2010, IHO Marc Weiner considered the Parents' concerns with the DOE's failure
to appropriately group D.B. for instruction and to be able to provide him with appropriate
sensory integration support throughout the day and found these concerns to be appropriate. *See*
Exhibit B at 25-26.

**First Claim for Relief**
**(Denial of FAPE in Violation of the IDEA)**

107.    Plaintiffs repeat and reallege the allegations stated in paragraphs 1 through 106 as

if fully set forth herein.

108.    In violation of the IDEA (20 U.S.C. § 1400 *et seq.*), Defendant denied D.B. a

FAPE for the 2011-2012 academic year.  Such denial results from the substantive

inadequacies in the IEP and the proposed placement at P.S.79, as described above or

as otherwise may be established.

**Second Claim for Relief**
**(Denial of Rights Under Section 504 of the Rehabilitation Act)**

109.    Plaintiffs repeat and reallege the allegations stated in paragraphs 1 through 106 as

if fully set forth herein.

110.    By failing to confer the benefits provided to D.B. under the IDEA as amended (20

U.S.C. § 1400 *et seq.*), Defendant has violated Section 504 of the Rehabilitation Act

(29 U.S.C. § 794) and the regulations promulgated there under.

**Third Claim for Relief**
**(Denial of Rights Under New York State Law)**

111.    Plaintiffs repeat and reallege the allegations stated in paragraphs 1 through 106 as

if fully set forth herein.

112.    Defendant has violated Article 89 (N.Y. Educ. Law § 4400 *et seq.*) and

regulations promulgated thereunder by failing to provide D.B. with a FAPE, as set

forth above or as otherwise may be established.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court:

a.   reverse the SRO's decision of October 17, 2012;

b.  hold that the DOE failed to provide D.B. with a FAPE for the 2011-2012 school year;

c.  conduct an independent review of the record and render a determination that the Rebecca School placement was appropriate for D.B. for the 2011-2012 school year;

d.  conduct an independent review of the record and render a determination that a consideration of the equities supports the Parents' request for reimbursement of tuition paid to the Rebecca School for the 2011-2012 school year;

e.  order the DOE to reimburse Plaintiffs for tuition paid to the Rebecca School for the 2011-2012 school year;

f.  declare that Plaintiffs are the substantially prevailing party;

g.  grant leave, pursuant to governing law, to Plaintiffs' counsel to submit a fee application for the purpose of recovering statutory attorneys fees and other recoverable costs incurred at the administrative level, the SRO level, and in this action; and,

h.   grant Plaintiffs any additional relief as the Court deems appropriate.


Dated: New York, New York
February 19, 2013


Respectfully Submitted,


**SKYER & ASSOCIATES, L.L.P.**

By:   _____
JESSE COLE CUTLER
276 Fifth Avenue, Suite 402
New York, NY 10001
(212) 532-9736
jcutler@skyerlaw.com

*Attorneys for D.B.*

30